O

| | |
|---|---|
| RUFINA LILIA MARTINEZ, | Case No. CV-16-03296-KES |
| Plaintiff, | |
| v. | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, Acting | AND ORDER |
| Commissioner of Social Security, | |
| Defendant. | |

Rufina Lilia Martinez ("Plaintiff") appeals the final decision of the Social Security Commissioner denying her application for supplemental security income ("SSI"). For the reasons stated below, the Commissioner's decision is AFFIRMED.

## I.

## PROCEEDINGS

Plaintiff applied for SSI on March 20, 2012, alleging disability beginning on January 10, 2008. Administrative Record ("AR") 123. A hearing was held before an administrative law judge ("ALJ") on April 9, 2014, but was continued so that Plaintiff could obtain representation. AR 114-122. The continued hearing took place

on July 17, 2014, at which Plaintiff was represented by counsel and assisted by a Spanish-language interpreter.  AR 97-113.  The ALJ issued a decision denying benefits on September 17, 2014.  AR 35-51.

## II.

## STANDARD OF REVIEW

### A.  Substantial Evidence and Harmless Error.

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

"A decision of the ALJ will not be reversed for errors that are harmless."  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination."  Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

### B.  The Five-Step Evaluation Process.

A person is "disabled" for purposes of receiving Social Security benefits if he is unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  A claimant for disability benefits bears the burden of producing evidence to demonstrate that he was disabled within the relevant time period.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

The ALJ follows a five-step sequential evaluation process in assessing whether

2

a claimant is disabled. 20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. 20 C.F.R. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a medically determinable "severe" impairment or combination of impairments that significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. <u>Id.</u> § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, then the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. <u>Id.</u> § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC") to perform his past work; if so, the claimant is not disabled and the claim must be denied. <u>Id.</u> § 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. <u>Drouin</u>, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. <u>Id.</u>

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. 20 C.F.R. § 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. <u>Id.</u> § 416.920; <u>Lester</u>, 81 F.3d at 828 n. 5; <u>Drouin</u>, 966 F.2d at 1257.

**C.  The ALJ's Application of the Five-Step Evaluation Process.**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date through her last date of insurance ("LDI"), March 31, 2011.  AR 43.

At step two, the ALJ determined that prior to her LDI, Plaintiff had the medically determinable impairments of "low back pain with evidence of disc bulges" and "bilateral wrist pain."  AR 43.  The ALJ determined, however, that these impairments were not "severe" within the meaning of 20 C.F.R. § 416.920 prior to March 31, 2011. AR 46.  The ALJ therefore concluded that Plaintiff was not disabled for purposes of receiving SSI.  AR 46-47.

**III.**

**ISSUES PRESENTED**

The sole issue presented is whether the ALJ's finding that Plaintiff's lower back pain and wrist pain were "not severe" prior to March 31, 2011, is supported by substantial evidence.  (Dkt. 22 ["JS"] at 4.)  The parties' analyses of this issue raise the following three sub-issues:

(1)  Was the ALJ required to evaluate the opinion of Dr. Bruce Fishman, a doctor who examined Plaintiff once on September 7, 2011 (i.e., approximately five months after her LDI) and wrote a report for Plaintiff's workers' compensation claim?  If so, did the ALJ give an adequately supported reason for discounting Dr. Fishman's opinions?

(2)  Was the ALJ required to evaluate summaries of pre-LDI medical records in Dr. Fishman's report?  If so, was the ALJ's evaluation supported by substantial evidence?

(3)  Was the ALJ required to develop the record further?

**IV.**

**SUMMARY OF ADMINISTRATIVE RECORD**

Plaintiff applied for SSI alleging that she was unable to work as of January 10,

4

2008, due to an industrial accident causing "neck, hip injury, left eye injury, arthritis." AR 123.  Plaintiff provided the following history to Dr. Fishman:

In January 2008, Plaintiff was employed as a laundry service worker for University Village.  AR 273.  On January 10, 2008, she "flexed forward" and "some of the [laundry] chemicals splashed up into her face and into both of her eyes."  Id. She "jerked suddenly backward in response …" which injured her lower back.  Id. Three days later, she reported her eye injury to University Village in writing, but she said nothing about her back injury, because a human resources representative told her that she might lose her job if she did so.[1]  Id.  She was "evaluated and discharged with a return to work full duty."  Id.  Three medical evaluations dated from January 2008 summarized by Dr. Fishman say nothing about back pain – only eye irritation. AR 289.

Plaintiff continued working in laundry services "doing all of her full work duty activities," but she was terminated about a month after her accident on February 8, 2008.  AR 273-74.  She told the ALJ that she stopped working due to an "accident at work" wherein she injured her "lower back" and "hands" and "leg, but I didn't count that" and "got liquid in [her] eyes." AR 103-04.

After being terminated, she hired an attorney to prosecute a workers' compensation claim.  AR 274.  A few days later, on February 20, 2008, she visited Dr. Williams and told him that she injured her "low back, left buttock and back of left leg" while cleaning tablecloths.  AR 289 (Dr. Fishman's summary).  She "stat[ed] she bent down to pick something up, and when she tried to straighten out, she could not."  Id.  She told Dr. Williams that her lower back pain "causes difficulty with all aspects of self-care …" and radiates "to the left leg constantly and at times to the

---

[1] Plaintiff later told Dr. Fishman that "initially when she reported the injury, her eye was a problem and she forgot to discuss the lumbar spine, but as the low back pain worsened, she then brought it up …." AR 293.

right" at a level of 8/10. Id. She walked favoring her left leg. AR 289-90. In addition to the injuries sustained on January 10, she reported pain in her neck, shoulders, elbow, forearms, wrists, hands and fingers at a level of 7/10. AR 289.

Between March and October of 2008, Plaintiff continued to see multiple doctors for her workers' compensation claim, but those treatment records are not in evidence. The AR does contain summaries of those records by Dr. Fishman, who summarized them as follows:

• 3/19/08: Plaintiff returns to Dr. Williams with pain complaints identical to those made during her first visit. He does several tests resulting in a diagnosis of cervical and lumber radiculitis[2] and then orders cervical and lumber MRI scans to confirm. AR 290.

• 4/4/08: Dr. Eliaspour records her subjective complains of wrist and back pain "with radiation down both legs" and diagnoses her with a "lumbar spine possible disc bulge." Id.

• 4/7/08: Dr. Danesh renders opinions similar to Dr. Eliaspour's. He explains Plaintiff's hand pain as follows: "Continuous and sudden change of temperature on hands because of switching between washing and ironing." AR 291.

• 4/8/08: Dr. Schilling relates that Plaintiff "injured her neck and back when she got chemicals on her hands and in her eyes." Id. He records Plaintiff is experiencing "low back pain radiating to both legs, right greater than left." Id. He reports that she had a "normal" EMG[3] of the cervical spine, but an "abnormal" EMG

---

[2] "Radiculitis is not technically a condition in itself, but is a term used to describe the symptoms felt when a nerve or nerve root is pinched, irritated, inflamed, or simply put, just not working properly." See http://www.atlanticspinecenter.com/conditions/radiculitis/.

[3] "Electromyography (EMG) is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). … EMG results can reveal nerve dysfunction, muscle dysfunction or problems with nerve-to-muscle signal transmission." See Mayo Clinic, http://www.mayoclinic.org/tests-procedures

of the lumber spine "consistent with chronic left S1 Radiculopathy." Id. He recommended "continued conservative care for symptomatic relief." Id.

• 4/16/08: Dr. Eliaspour writes a "progress report" that mirrors his 4/4/08 report.

• 5/12/08: Dr. Missirian does a "comprehensive orthopedic medical legal evaluation." AR 291. He explains that Plaintiff "sprayed spot remover[4] on a tablecloth and due to the hardness of the cloth, the spray bounced back on to her face" and she "abruptly moved back, causing pain to her lower back." Id. Plaintiff denies any prior accidents or injuries.[5] Id. Dr. Missirian requests authorization for "epidural steroid injections" and spinal x-rays for "further evaluation." AR 292.

• 6/10/08: Plaintiff sees internist Dr. Koshak who, in addition to reporting her back pain, evaluates her for knee pain, reviews a chest x-ray, determines she has elevated glucose levels, and requests an echocardiogram. Id.

• 6/19/08: Dr. Missirian sees Plaintiff again and determines she has "medical clearance to undergo a serious of caudal epidural injections." Id. Plaintiff later told Dr. Fishman that while she was referred for injections to help her lower back pain, "these were never actually performed." AR 274.

• 6/30/08: Dr. Eliaspour writes a "progress report" noting that Plaintiff is still complaining of back pain that radiates down both legs and a now a decreased range of motion in her wrists with "pain upon movement." AR 292.

• 8/25/08: Dr. Eliaspour writes another "progress report" describing low back pain and again suggests "possible disc bulge." AR 293.

_____

/emg/basics/definition/prc-20014183.

[4] Compare AR 289 (Dr. Fishman's summary of 1/24/08 treating record noting that Plaintiff "states water containing lots of chemical splashed in her eyes").

[5] Plaintiff told others that she suffered a work-related accident in 2000 that caused injury to her neck and head. AR 276, 293.

• 8/27/08: Plaintiff is evaluated by a psychologist to whom she reports that her injury has "not improved at all" and the "pain is actually worse." AR 293.

• 10/1/08: Dr. Eliaspour writes a "permanent and stationary report." AR 293. He reports that her low back pain is now only "intermittent" and "slight to moderate," while her "left up extremity pain" is "frequent" but "slight." AR 293. She reports "numbness in both hands at nighttime." AR 294. From a review of diagnostic studies, he opines she has "posterior disc bulges" at various lumbar vertebrae. Id. He opines she is precluded from "very forceful strength activities and fine manipulation" with her left arm and precluded from "repetitive motions of the back." Id. She is referred to a chiropractor for treatment. Id.

On December 15, 2008, Plaintiff went to the emergency room complaining of lower back pain. AR 294, 438-55, 471-72 (firsthand source records). She denied any "radiation of pain into the legs" and told the doctors she had been receiving chiropractic treatments and taking ibuprofen. AR 471. The ER doctor requested and reviewed an x-ray of Plaintiff's lumbar spine which he interpreted as showing "degenerative changes without any acute fractures or dislocations." Id. She was given Dilaudid and Zofran, after which "she felt substantially better." Id. She was told to "return for worsening." AR 472.

The next chronological treatment record shows that Plaintiff visited the ER nearly two years later, on November 15, 2010, complaining of a "stiff neck." AR 424-37; see also AR 294 (gap in Dr. Fishman's summary of treatment records from 12/15/08 to 2/9/11). She said she "woke up with pain" and was not presently taking any medications, although she had a history of chronic neck pain.[6] AR 427. Plaintiff was given Toradol, after which she reported decreased pain. AR 426. She

---

[6] In September 2011, Plaintiff reported that she suffered a work-related neck injury in 2000 and "had constant low grade neck pain since that time." AR 276. She denied to Dr. Fishman "any change" in her neck pain attributable to her work or accident at University Village. Id.

8

1  was discharged in "good" condition, prescribed ibuprofen and Vicodin, and advised
2  to rest and apply ice and heat to her neck.  AR 428.

3      In February 2011, Plaintiff visited an ophthalmologist complaining that her
4  left eye had "gone blurry" since the 2008 laundry accident.  AR 294.  The
5  ophthalmologist determined that she had a "left eye cataract," such that her blurry
6  vision was not caused by the accident.  AR 295.

7      While these are the only medical records that pre-date Plaintiff's LDI, Plaintiff
8  argues that the ALJ should have considered Dr. Fishman's report dated September 7,
9  2011, after Plaintiff's LDI.  JS at 8-9.  Plaintiff told Dr. Fishman that her wrist pain
10  pre-dated her January 10, 2008 accident; it started shortly after she began working
11  for University Village in October 2007.  AR 274.  She attributed her wrist pain to
12  laundry work that required "constant lifting and carrying up to 30 pounds," but
13  admitted she never reported this to her employer.  AR 274.  Dr. Fishman later noted
14  that from October 2007 through December 2008, Plaintiff worked in housekeeping
15  services at University Village, and she only changed to working in the laundry service
16  in October 2008.  AR 276.  These dates are inconsistent with the stated dates of her
17  laundry accident (January 2008) and termination (February 2008).

18      Plaintiff also told Dr. Fishman that her back pain radiates down her legs with
19  the "right being more symptomatic than the left."  AR 275; compare AR 289-90
20  (summaries of earlier records noting Plaintiff's left side was worse and that she
21  favored her left leg when walking).  Dr. Fishman observed her gait to be "normal."
22  AR 278.  He also reported that Plaintiff's back pain is "relieved somewhat with
23  application of ice" (AR 275); she was still not taking any pain medication as of
24  September 2011 (AR 277); and she denied any history of arthritis (id.).

25      Plaintiff told Dr. Fishman that her pain was so severe, she "has difficulty
26  brushing her teeth or combing her hair."  AR 310; compare AR 233 (4/10/12 form
27  completed by Plaintiff, stating that Plaintiff does not need assistance with personal
28  needs such as "feeding, dressing, cleaning of residence").  Dr. Fishman, however,

observed "relatively few pain behaviors … during this examination." AR 310. He also noted that when Plaintiff was referred for a functional capacity evaluation, she "exhibited overt pain behaviors, but her subjective complaints were inconsistent with her physiological response to the tasks she was required to perform." AR 316 (emphasis in original).

In his report, Dr. Fishman explains that he performed tests to measure Plaintiff's spinal range of motion. AR 278, 284-85. All the "orthopedic tests and signs" he performed to evaluate her back pain had "negative" results. AR 285. He also reviewed x-rays of Plaintiff's spine and wrists taken on the same day as his exam. AR 271. The lumber x-rays showed "degenerative disc disease" and some "narrowing" of the disc space at L2-3 and L3-5, but "normal" disc space at L4-5 and L5-S1. AR 286. The cervical x-rays showed "degenerative disk changes" at C5-6 and "slight" changes at C6-7. His concluding impression from both x-rays was "degenerative disc changes." AR 286-87. He opined this condition was caused by "the natural progression of her non-industrial degenerative disc disease." AR 316; see also AR 318 (noting that degenerative changes were seen in the May 2008 x-rays taken only five months after the laundry accident, which is "far too short a time span" for the changes to have developed because of a January 10, 2008 event). He further noted that degenerative disc disease is associated with smoking, and Plaintiff smoked ¼ pack of cigarettes every day for 20 years. AR 317. He did not recommend any treatment beyond "home exercise." AR 312.

He also reviewed 2008 MRIs of Plaintiff's lumbar spine and concluded that they showed only "mild degenerative changes" and a 3-4mm "posterior disc bulge" at L1-2, but no "stenosis or neural foraminal narrowing," conditions associated with back pain. AR 288.

Finally, Dr. Fishman also examined Plaintiff's wrists and hands and measured her wrist range of motion. AR 280. He recorded the motor strength of her wrists as 5/5. AR 286. He reviewed September 2011 x-rays of both wrists and concluded they

were "essentially normal." AR 287. He found she had "0%" impairment of both
wrists. AR 307-08. He also reviewed a May 2008 MRI of her left wrist which was
"unremarkable" but for a cyst. AR 288.

## V.

## APPLICABLE LAW

### A.  Making Severity Determinations.

At step two of the sequential evaluation process, the ALJ must decide whether
the claimant has any severe medically determinable impairment(s). A "medically
determinable impairment" exists where "medical signs and laboratory findings …
show that you have a medical impairment(s) which could reasonably be expected to
produce the pain or other symptoms alleged…." 20 C.F.R. § 416.929(a) (2014).[7]

Once a claimant has shown that he suffers from a medically determinable
impairment, he next has the burden of proving that these impairments are "severe."
Edlund v. Massanari, 2001 U.S. App. LEXIS 17960, at * 23 (9th Cir. Aug. 9, 2001).
An impairment is "severe" if it significantly limits a claimant's physical or mental
ability to perform basic work activities. 20 C.F.R. § 416.920(c). Basic work
activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. §
416.921(b) (2014). Examples of physical work activities include walking, standing,
sitting, reaching and carrying. Id. A severe impairment is one that has "more than a
minimal effect on the individual's ability to do work." Social Security Ruling
("SSR") 96-2p. Conversely, an impairment is "non-severe" if it does not
significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §

---

[7] The regulations applicable to SSI claims were amended in March 2017.
However, the Court applies the regulations in effect at the time of the ALJ's
September 2014 decision. Where the 2014 regulations differed from the regulations
currently in effect, the Court has marked the regulation with the year "(2014)." None
of the subsequent changes would have had a material effect on the outcome of this
case.

416.921(a) (2014). If a claimant does not have a medically determinable impairment that is "severe" over a period of at least 12 consecutive months, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii), 416.909.

The ALJ must consider the combined effect of all the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe. 42 U.S.C. § 423(d)(2)(B); SSR 86-8, 85-28. The ALJ must also consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity. SSR 88-13; 20 C.F.R. § 416.920(c). "The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Bowen v. Yuckert, 482 U.S. 137, 153 (1987).

**B.    Weighing Conflicting Medical Evidence.**

In deciding how to resolve conflicts between medical opinions, the ALJ must consider that there are three types of physicians who may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did not treat or examine the plaintiff. See 20 C.F.R. § 416.927(c) (2014); Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than that of an examining physician, which is generally entitled to more weight than that of a non-examining physician. Lester, 81 F.3d at 830. Thus, the ALJ must give specific and legitimate reasons for rejecting a treating physician's opinion in favor of a non-treating physician's contradictory opinion or an examining physician's opinion in favor of a non-examining physician's opinion. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); Lester, 81 F.3d at 830-31 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983)).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester, 81 F.3d at 830 (citing

Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The factors to be considered by the adjudicator in determining the weight to give a medical opinion include: "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Orn, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

**C.      Evaluating the Claimant's Subjective Symptom Testimony.**

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In doing so, the ALJ may consider testimony from physicians "concerning the nature, severity, and effect of the symptoms of which [the claimant] complains." Id. at 959. If the ALJ's credibility finding is supported by substantial evidence in the record, courts may not engage in second-guessing. Id.

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce

13

the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014). The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ may also use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for lying and inconsistencies in his statements or between his statements and his conduct. Smolen, 80 F.3d at 1284; Thomas, 278 F.3d at 958-59.[8]

_____

[8] The Social Security Administration ("SSA") recently published SSR 16-3p, 2016 SSR LEXIS 4, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims. SSR 16-3p eliminates use of the term "credibility" from SSA policy, as the SSA's regulations do not use this term, and clarifies that subjective symptom evaluation is not an examination of a claimant's character. Murphy v. Comm'r of Soc. Sec., 2016 U.S. Dist. LEXIS 65189, at *25-26 n.6 (E.D. Tenn. May 18, 2016). SSR 16-3p took effect on March 16, 2016, and therefore is not applicable to the ALJ's earlier decision in this case. Id.

## D.    Developing the Record.

The claimant bears the burden of producing evidence to support a finding of disability.  See 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require").  The Code of Federal Regulations further explains:

> [Y]ou have to prove to us that you are blind or disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairments(s).  If material to the determination [of] whether you are disabled, medical and other evidence must be furnished about the effects of your impairment(s) on your ability to work … on a sustained basis.  We will consider only impairment(s) you say you have or about which we receive evidence.

20 C.F.R. § 416.912(a) (2014).

Nevertheless, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."  Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) (holding duty not met where ALJ proceeded without a hearing).  This duty, however, is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  When triggered, the ALJ may discharge this duty in several ways, including: "subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

## DISCUSSION

**A.**   **Sub-Issue One: The ALJ's Reason for Discounting Dr. Fishman's Post-LDI Opinions is Supported by Substantial Evidence in the Record.**

Plaintiff contends that ALJ was required to consider Dr. Fishman's functional assessment of Plaintiff, because it occurred close enough to her LDI (i.e., September 7, 2011, about five months after her March 31, 2011 LDI) to be relevant.  JS at 8-9.

**1.**   **The ALJ's Analysis.**

At step two of the evaluation process, the ALJ considered some of the medical evidence along with Plaintiff's hearing testimony and her statements in two social security forms.  AR 44.  At the July 17, 2014 hearing, Plaintiff testified that her pain is "constant" and "severe."  AR 104-05.  She reported that she could only sit for 10 to 15 minutes at a time.[9]  AR 106.

As for the medical evidence, the ALJ noted that there were only two firsthand treatment records dating from before March 31, 2011: Plaintiff's ER visits in December 2008 (for back pain) and in November 2010 (for neck pain).  AR 45.  The ALJ also noted the existence of Dr. Fishman's report, but found that since it was prepared months after her LDI, it was "not controlling for the adjudicative period at issue."  Id., citing AR 270-321.  Finally, the ALJ noted that Dr. Fishman's report "does make reference to prior medical records from 2008-2009," but those records "are not present in the medical evidence herein plus the records discussed refer only to disc bulges and not much more."  AR 45.

The ALJ assigned "great weight" to the opinions of state agency reviewing physicians Drs. Frankel and Cooper.  AR 45.  Dr. Frankel reviewed the medical evidence of record (including Dr. Fishman's report) and opined that there was

---

[9] In a form dated 4/11/2013, Plaintiff reported, "I cannot sit for more than 5 minutes or stand for more than 3 minutes."  AR 266.

"insufficient medical evidence for a determination of the claimant's impairments prior to the date last insured." AR 45-46, citing AR 126-28. Dr. Cooper reviewed Dr. Frankel's report and affirmed its conclusions. AR 46, citing AR 134.

As for Plaintiff's subjective pain testimony, the ALJ found it less than fully credible. AR 44, 46. The ALJ determined that Plaintiff's self-reported "extreme limitations" were "inconsistent with the medical evidence and her activities of daily living," such as household chores and shopping. AR 46. On appeal, Plaintiff does not challenge this adverse credibility determination.

Relying on the lack of sufficient medical evidence from the relevant dates, as determined by Drs. Frankel and Cooper, and the fact that prior to March 31, 2011, there was no evidence that Plaintiff had undergone "extensive therapies" for pain management or received a recommendation for surgery, the ALJ concluded that Plaintiff's medically determinable impairments were non-severe prior to her LDI. AR 46.

**2.      Analysis.**

An ALJ need not discuss "*all* evidence" presented by a claimant. <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Rather, the ALJ need only explain why he rejected "significant probative evidence." <u>Id.</u> (holding ALJ did not err by failing to mention psychiatrist's letter prepared years after he last treated the claimant).

Per the Ninth Circuit, "reports containing observations made after the period for disability are relevant to assess the claimant's disability. … It is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." <u>Smith v. Bowen</u>, 849 F.2d 1222, 1226 (9th Cir. 1988). The Ninth Circuit has specifically held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition." <u>Lester v. Chater</u>, 81 F.3d 821, 832 (9th Cir. 1995) (holding that the ALJ erred in rejecting an examining psychologist's opinion that was

completed "several months" after the claimant's LDI, because the opinion's timing "would be a reason to give [it] less weight" but "not a reason to give preference to the opinion of a doctor who has never examined the claimant").

That said, an "ALJ may properly consider the remoteness of a medical evaluation in weighing a medical opinion." Perkins v. Colvin, 2016 U.S. Dist. LEXIS 129892, at *22 (W.D. Wash. Aug. 30, 2016). "Remoteness is most relevant where the medical opinion is based entirely on an examination that is outside the relevant period under consideration." Id. This means that an ALJ may entirely "disregard" a medical opinion rendered so far after the LDI that it is "reasonably" considered too "remote[]" to have probative value. Lombardo v. Schweiker, 749 F.2d 565, 567 (9th Cir. 1984) (ALJ properly disregarded opinion of treating physician who examined claimant a year and a half after the relevant period).

The ALJ may also disregard post-LDI medical opinions that describe a deterioration in the claimant's condition after the covered period. Smith, 849 F.2d at 1226; see also Hall v. Secretary of Health, Educ. & Welfare, 602 F.2d 1372, 1377 (9th Cir. 1979) (new evidence "was of extremely doubtful relevance because it was based on an examination eight months after [claimant's] insured status); Martin v. Chater, 1995 U.S. App. LEXIS 36201, at *4-5 (9th Cir. Dec. 4, 1995) (ALJ properly disregarded medical opinion based on exam conducted six months after claimant's insured status expired and that was controverted an earlier opinion); Chavolla v. Colvin, 2014 U.S. Dist. LEXIS 32132, at *5-6 (C.D. Cal. Mar. 11, 2014) ("Dr. Lane's opinions from July and September 2009 were not probative evidence of plaintiff's limitations during the earlier, relevant period of June 27, 2007, to May 20, 2009…."); Clark v. Astrue, 2009 U.S. Dist. LEXIS 74125, *14-15 (C.D. Cal. Aug. 20, 2009) (ALJ properly "rejected" treating physician's letter written eight months after LDI indicating RSD prevented Plaintiff from using his right arm because it was not based on "any objective findings concerning Plaintiff's RSD from the insured period"); Mitchell v. Astrue, 2008 U.S. Dist. LEXIS 11982, at *30-31 (E.D. Cal. Feb. 15, 2008)

18

(ALJ properly gave less weight to opinions from January and April 2004 where the claimant's LDI was March 31, 2003).

Here, Dr. Fishman's opinions were based largely on his own examination which occurred on September 7, 2011. AR 270. This was five months after Plaintiff's LDI, a time period comparable to the six-month and two-month lapses found long enough to render medical opinions less probative in <u>Martin</u> and <u>Chavolla</u>. Dr. Fishman had never previously treated Plaintiff. AR 270. While he did review imaging studies and medical records that pre-dated Plaintiff's LDI, much of his report discussed his own examination and imaging studies that he ordered after Plaintiff's LDI. AR 302-321. He ultimately found that Plaintiff's wrists were not affected by a medically determinable impairment, let alone an impairment that significantly impacted her ability to perform basic work activities at any time. AR 287-88. While he found that Plaintiff's back pain did limit her functionality, he also acknowledged that she suffered from a condition (i.e., degenerative disc disease) that by its nature gets worse over time. AR 316-18. He did not offer any opinions concerning Plaintiff's functional limitations prior to her LDI, but he did opine that the physical abnormalities visible in the May 2008 spinal imaging could not have developed exclusively after January 10, 2008, meaning that they existed to some degree when Plaintiff was still able to perform laundry services.[10] <u>Id.</u>

The ALJ did not ignore Dr. Fishman's report as lacking any probative value because of its date. Rather, the ALJ determined that its date meant that it was "not controlling," i.e., that it should be given less weight than the conflicting, firsthand

---

[10] The mere fact that Plaintiff had degenerative disc disease while insured does not establish that she had a "severe" impairment while insured. <u>See</u>, <u>e.g.</u>, <u>Spiteri v. Colvin</u>, 2016 U.S. Dist. LEXIS 178256, at *17 (N.D. Cal. Dec. 23, 2016) (finding degenerative disc disease not severe); <u>Rivers v. Colvin</u>, 2015 U.S. Dist. LEXIS 158172, at *8 (C.D. Cal. Nov. 20, 2015) (same); <u>Hunter v. Colvin</u>, 2014 U.S. Dist. LEXIS 158702, at *10 (C.D. Cal. Nov. 10, 2014) (same).

19

ER treatment records from Plaintiff's period of insurance which did not show the existence of any severe impairments lasting twelve consecutive months.[11]  This was a rational manner of resolving conflicts in the medical evidence and was supported by substantial evidence in the record.

In any event, Plaintiff has not shown that the ALJ's disability determination would have been different had he afforded more weight to Dr. Fishman's opinions. As discussed above and consistent with the opinions of Drs. Frankel and Cooper, Dr. Fishman's report does not provide sufficient evidence to support a finding that Plaintiff's back pain or wrist pain were "severe" impairments before March 31, 2011. Dr. Fishman opined that Plaintiff's wrists were "essentially normal" with no functional impairments.  AR 287, 207-08.  While Dr. Fishman opined that Plaintiff's back pain caused some functional limitations as of September 2011, he offered no opinions concerning her pre-LDI functionality.  Given the progressive nature of degenerative disk disease and the conflicting evidence[12] in the record about when Plaintiff experienced any back pain, the ALJ was not required to assume that her condition five months earlier was the same as when Dr. Fishman examined her in September 2011.  The ALJ, therefore, did not error in treating Dr. Fishman's report as "not controlling" due to its post-LDI date.

_____

[11] As summarized above, the ER records showed one-time treatments for back and neck pain without any follow-up or extended use of prescription pain medication. AR 424-37, 438-55, 471-72.

[12] Dr. Fishman disputed Plaintiff's account that she was fine on January 9, 2008, but disabled on January 10, 2008, due to degenerative disk disease, the only medically determinable impairment affecting her back.  AR 317-18.  Plaintiff declined injections.  AR 274.  In October 2008, Plaintiff's back pain was only "intermittent" and "slight to moderate."  AR 293.  Records from Plaintiff's ER visit on November 15, 2010, say nothing about back pain.  AR 424-37.

**B.**     **Sub-Issue Two: The ALJ was Not Required to Evaluate Secondhand Medical Summaries as Evidence.**

Plaintiff argues that even if the post-LDI preparation date of Dr. Fishman's report is a valid reason to discount his opinions, it is not a valid reason to discount the summaries in his report of medical records from Plaintiff's insured period.  JS at 6.  Plaintiff further argues that those summaries demonstrate Plaintiff's back and wrist pain were "severe" impairments prior to March 31, 2011.  JS at 6-8.

The Commissioner counters, "Plaintiff cites no legal authority that requires the ALJ to evaluate secondhand summaries of medical records."  JS at 14.  The Commissioner also points out that that ALJ did consider those summaries and accurately summarized them as referring "only to disc bulges and not much more," such that even considering those summaries, substantial evidence would still support the ALJ's severity determination.  Id., citing AR 45.

**3.     Analysis.**

The social security regulations broadly define "evidence" as "anything you or anyone else submits to us or that we obtain that relates to your claim."  20 C.F.R. § 416.912(b) (2014).  The regulations list several categories of medical evidence, but they do not refer to secondhand summaries of earlier medical records.  20 C.F.R. § 416.912(b)(1)-(8).

The Court has located at least three district court opinions considering whether ALJs have a duty to analyze secondhand summaries as evidence; all three concluded that no such duty exists.  First, in Tighe v. Colvin, 2014 U.S. Dist. LEXIS 121226 (C.D. Cal. Aug. 28, 2014), plaintiff argued that the ALJ erred by not discussing the permanent and stationary report of treating physician Dr. Pautz.  Id. at *3.  Plaintiff, however, failed to produce the actual report.  Instead, the record contained a report by Dr. Evans that referenced Dr. Pautz's report.  Id.  The court determined that the ALJ did not err in failing to evaluate Dr. Pautz's report, because "the references to the report in Dr. Evans's opinion did not provide a sufficient basis for the ALJ to

assess the weight of that opinion." <u>Id.</u> at *6. "Without a copy of the [Pautz] report itself, the ALJ was unable to assess the objective findings on which it was based, a critical determination required to assess whether the opinion is entitled to controlling weight." <u>Id.</u> at *6, citing <u>Batson v. Comm'r of SSA</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).

Similarly, in <u>Cox v. Astrue</u>, 2012 U.S. Dist. LEXIS 161230 (C.D. Cal. Nov. 9, 2012), the record contained a report by Dr. Kadaba that referenced several earlier reports by Dr. Portnoff. <u>Id.</u> at 19 n.4. The references were substantial enough to show that Dr. Portnoff had examined plaintiff at least twice, reviewed plaintiff's medical records and history, and formed diagnostic impressions. <u>Id.</u> at *19-20. Nevertheless, the district court concluded, "Because Dr. Portnoff's reports are not included in the Administrative Record, his opinions do not constitute evidence and are discussed only to provide context." <u>Id.</u> at 19 n.4.

Finally, in <u>Edwards v. Massanari</u>, 2001 U.S. Dist. LEXIS 8750 (S.D. Ala. June 5, 2001), the administrative record included a letter from plaintiff's counsel describing IQ testing performed by a qualified medical source. <u>Id.</u> at *2. Plaintiff contended that the ALJ "improperly rejected" this evidence. <u>Id.</u> The court determined that a letter asserting "a treating source's findings does not constitute evidence." <u>Id.</u>

The Court agrees with the reasoning of these cases, and finds that the ALJ in this case was not required to consider Dr. Fishman's summaries of other doctors' records as "evidence." While some of the summaries distinguish "subjective complaints" from "objective findings," others do not. AR 289-295. The summaries are full of inconsistences concerning how Plaintiff claimed to have injured her back on January 10, 2008 (<u>compare</u> AR 289-291 [bending or jumping back]), whether that event caused her subsequent back pain (AR 316-17 [disc disease unrelated to laundry accident]), whether her right or left leg experienced more pain (<u>compare</u> AR 289-91), whether her pain increased with movement or with sleep (<u>compare</u> AR 292, 294),

whether her pain was getting worse or improving (AR 293) and whether Plaintiff received only chiropractic treatment (compare AR 290 ["Rx meds"] with AR 291 ["continued conservative care"]). The ALJ had no obligation to try to unravel these inconsistencies and weigh the conflicts in the various summarized reports without having the reports themselves in evidence.

It is true that, as non-examining consulting physicians, Drs. Frankel and Cooper reviewed and summarized Plaintiff's medical records, and issued opinions based on those records. The ALJ then relied on those opinions. Drs. Frankel and Cooper's opinions are distinguishable from Dr. Fishman's summaries, however. Drs. Frankel and Cooper analyzed the available medical records for their overall effect on Plaintiff's RFC during the relevant time period, i.e., before the LDI. Dr. Fishman, on the other hand, based his opinion on his own clinical observations and imaging studies, which were made after Plaintiff's LDI. Dr. Fishman did not attempt to give an opinion that was based solely on the pre-LDI medical records he reviewed. Furthermore, as to the opinions of Dr. Frankel and Cooper, the ALJ could review all of the medical records that they reviewed, and independently decide whether their opinions were consistent with those records. The records Dr. Fishman summarized, in contrast, were not available to the ALJ.

## C.    Sub-Issue Three: The ALJ had No Duty to Further Develop the Record.

Plaintiff contends that if Drs. Frankel and Cooper lacked sufficient evidence to opine whether Plaintiff's impairments were severe prior to the LDI, then the ALJ was obligated to develop the record more. JS at 10. The Commissioner counters that the ALJ had no duty to further develop the record, because "the ALJ did not find the evidence was ambiguous; to the contrary, he evaluated the evidence of record and concluded it did not support a finding of severity." JS at 15.

### 1.    Facts Relevant to the Development of the Record.

While Plaintiff was representing herself in April 2012, she told the Commissioner, "I'm not able to provide any medical information because I do not

23

remember the names, addresses, and phone numbers of the doctors that I've seen for my injury."  AR 242.

At the initial hearing two years later in April 2014, the ALJ continued the proceedings so that Plaintiff could retain counsel.  AR 114-122.  Plaintiff asked if she needed to get all the records from her doctors, and the ALJ responded, "You should try to get all your medical records from doctors of course."  AR 121.  The ALJ further instructed Plaintiff to take a CD of all the evidence to her attorney.  AR 119.

In June 2014, the ALJ mailed Plaintiff a notice (which Plaintiff presumably showed to her attorneys) advising that the ALJ would be considering whether she was disabled on or before March 31, 2011.  AR 181.  The notice further explained that it was "very important that the evidence in [Plaintiff's] file is complete and up-to-date."  Id.  Plaintiff was instructed to mail any additional relevant medical records or bring them to the second hearing.  Id.

At the second hearing in July 2014, the ALJ asked her attorney if there were any additional relevant medical records, and counsel responded, "This is everything."  AR 100.

Plaintiff would have had occasion to collect her 2008-2010 medical records earlier than the 2014 hearings.  In June 2010, her deposition was noticed in workers' compensation litigation, and she was asked to produce all medical records relevant to the injuries she allegedly sustained in January 2008.  AR 196-98.  Contact information for Plaintiff's workers' compensation lawyer and Dr. Fishman (who presumably had the records he summarized) was therefore in the record and available to Plaintiff's counsel in this action.

**2.     Analysis.**

Plaintiff apparently contends that the ALJ had a duty to contact Dr. Fishman and/or Plaintiff's workers' compensation attorney to try to track down medical records from the relevant time period.  These sources were known and equally

available to Plaintiff's counsel. Plaintiff's counsel not only failed to procure the records prior to the hearing, but also represented to the ALJ that all the relevant records were already in the administrative record. Counsel did so knowing that Drs. Frankel and Cooper had opined that there was insufficient evidence to support a finding of disability at step two. After the ALJ issued his opinion declining to consider Dr. Fisher's secondhand summaries as evidence, counsel again could have obtained the underlying records and submitted them to the appeals council. If counsel was unable to procure any additional medical records from the relevant period, then there is no reason to think that the ALJ would have been more successful in doing so.

This was not a case in which the ALJ had no treating records from the relevant period. Rather, the ALJ had two sets of emergency room records. AR 424-37, 438-55, 471-72. Those records are not ambiguous. They show one-time treatment for back and neck pain approximately two years apart, and they establish that Plaintiff was not even taking prescription pain medication to manage ongoing symptoms on either occasion. Id.

The ALJ duly notified Plaintiff and her counsel that they needed to provide all medical records relevant to her insured period. Ultimately, Plaintiff failed to meet her burden at step two of providing evidence showing that she suffered from a medically determinable "severe" impairment during her insured period. The ALJ did not err by failing to continue the hearing a second time to seek years-old records that counsel already had the opportunity to obtain but did not consider relevant.

//
//
//
//
//
//

25

# VII.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: <u>April 24, 2017</u>

_Karen E. Scott_

KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE